People of the State of Illinois, Defendant in Error, v. John D. Shaw, Plaintiff in Error.

Gen. No. 10,647.

Fourth District.

November 8, 1965.

J. Waldo Ackerman, of Springfield, for plaintiff in error.

Basil G. Greanias, State's Attorney, of Decatur, for defendant in error.

SMITH, P. J.

Defendant prosecutes this writ of error from a judgment of the circuit court of Macon County finding him guilty of murder and imposing a life sentence.

Following indictment, the State's Attorney filed suggestion of insanity and on a trial of this issue, the jury

found the defendant sane. Defendant was rearraigned, entered a plea of not guilty, waived a trial by jury and proceeded to trial before the court. During all of the proceedings in the trial court, defendant was represented by lawyers of his own choice and of recognized trial expertise.

In the insanity hearing, the court instructed the jury that they might find the defendant insane if they found he does not understand the nature of the charge against him *and* that he is unable to cooperate with his lawyers in a proper defense of the case. He further instructed the jury they could find the defendant sane if they found that he fully understands the nature of the charge *and* is able to cooperate with counsel in a proper defense of this case. People v. Munroe, 15 Ill2d 91, 154 NE2d 225, is cited as condemning the use of the conjunctive and. In that case, insanity at the time of the crime was the prime defense; the evidence was in substantial conflict; other instructional error intervened, and the necessity for accurate instructions was vital. An instruction that insanity as a defense required the defendant lack not only the ability to distinguish between right and wrong, but also must lack the ability to choose between them was held error. The court observed that the existence of either precluded conviction. Under our new Code of Criminal Procedure, Ill Rev Stats 1963, c 38, § 104-1, a person charged with an offense is incompetent if he is unable to understand the nature of the proceedings against him *or* to assist in his defense. This statute was not in effect at the time of the trial and we see no cogent reason for its retroactive application to this case. We would further observe that the evidence on the sanity hearing was not preserved and we thus find it difficult to determine whether the instruction, if erroneous, could possibly have affected the verdict. We would further note that the jury found the defendant sane and were instructed that they could do this if he

fully understood the nature of the charge *and* was able to cooperate with his counsel. We can only presume that they found him qualified on both counts. This, together with his conduct during the principal trial begun three days later, demonstrates that the finding of sanity was not in error.

██ Defendant next complains that the three counts of the indictment charged the murder of Virginia Eades in the County of Macon and State of Illinois on December 17, 1960, without identifying the time or place further. It is suggested that he has the constitutional right to know the nature of the accusation against him so that he may adequately prepare his defense and plead the judgment in bar of a subsequent prosecution for the same offense. We would first observe that there was no statute in effect either at the time of the offense or at the time of the trial requiring further particularity as to time and place. This issue is raised for the first time in this court and is thus readily distinguished from People v. Williams, 30 Ill2d 125, 196 NE2d 483, where a motion to quash was filed in the trial court. We are a court of review and are not, as is sometimes stated with tongue-in-cheek, a court of original error. The alleged error is not before us for review. People v. Starr, 50 Ill App2d 399, 200 NE2d 118. The suggestion of double jeopardy is, we think, feigned rather than real. It is as unlikely that two Virginia Eades came to death by violent means in Macon County on December 17, 1960, as it is to find two needles of the same size in the same haystack. This contention is without merit.

██ It is next suggested that only a docket entry shows a waiver of trial by jury and it must be assumed that the waiver was not understandingly made. This is effectively refuted by the supplemental record. Defendant stated that his lawyers had advised him of his right to trial by jury; that he understood he had that right; the court then fully explained what the responsibilities of

265

the jury would be, and that the same issues could be submitted to the court without a jury. The defendant was then handed a jury waiver which, if signed, the court stated, "I will consider that you are saying: 'I do not want a jury trial.'" The waiver was then properly and, we think, knowingly signed.

■ It was stipulated that Virginia Eades came to her death on December 17, 1960, as a result of shooting by a shotgun. There were no eyewitnesses. The conviction rests on circumstantial evidence and statement attributed to the defendant. The defendant contends that the circumstances fail to show beyond a reasonable doubt that he did the shooting, but even if he did, he was too drunk to form an intent or have any malice and cannot, therefore, be guilty of murder. It seems clear that intoxication will negative the essential elements of general intent and malice in a murder case only where it is so extreme as to suspend the powers and preclude mental action on the defendant's part. People v. Hare, 25 Ill2d 321, 185 NE2d 178; People v. Cochran, 313 Ill 508, 145 NE 207.

The principals in this tragedy were the defendant, a married man whose divorce was apparently in process; Moxie, a girl friend of some four or five years standing; and Virginia Eades, the decedent for whom he had deserted Moxie for a period of time. He apparently left Virginia and returned to Moxie about November 20, 1960. He had paid Virginia $40 per week so she wouldn't have to work. Moxie loaned him money to buy a new station wagon and held his note for $3,800. On December 16, defendant had spent most of the day with her; cleaned his guns which he kept at her apartment; left to look over his mail, and returned to depart with her to buy a Christmas tree. Apparently they visited Rambo's Tavern between 6 and 7 p. m., had a drink of vodka and squirt and a fish sandwich, although neither defendant nor Moxie remember this. They then began to drink and

apparently between them drank approximately two quarts of vodka or more with a grapefruit juice mix. Moxie either passed out or went to sleep on the floor. Defendant drank 10–12 drinks of 4–5 ounces each and remembers nothing of the evening's occurrences after 8:30 or 9:00 p. m. The evidence further shows that prior to this time they had discussed Virginia. Defendant testified that something was wrong with Moxie and, after a few drinks, she said some female had called her stating that defendant and Virginia were mixed up again. He said it was a lie. Moxie also reminded him that he had said Virginia had called his father and said she must see the defendant.

The curtain rings down until sometime near 1:00 a. m. when Moxie awakened. Defendant was walking around and suggested they go get something to eat. They drove to Russ and Grace's where Virginia worked, saw her leaving in her car and waved to her. They did not stop but returned to Moxie's apartment where defendant told Moxie to get out and he drove away. Moxie testified there was nothing unusual about defendant's driving or his speech at this time. Moxie noticed the mess in the sink and the amount of liquor consumed. She became worried, called defendant's father and Virginia's mother. Virginia's mother verified these calls; one inquiring for defendant and one for Virginia. Defendant was gone for about an hour, returned to Moxie's and said: "I blew Virginia's brains out" and fell head first into a chair. She couldn't arouse him—she got him undressed and to bed. He reenters the scene about 10:00 a. m. the next morning.

Virginia Eades was next seen at Greider's Cafe about 1:15 a. m. About this time two police officers saw defendant in his car near the transfer house and headed toward Greiders. He ran a stop sign and almost ran into one officer's car. The officer drove along side of him, showed his badge and told him he had run a stop sign

267

and defendant replied, "If I did, I'm sorry." Neither officer noticed anything unusual with his manner, conduct, driving, or otherwise. Around 1:30 and after the second call from Moxie, Virginia's mother heard two shots as did one of her neighbors. Her mother found the body about 7:00 a. m. the next morning.

Moxie's version of the next morning is substantially as follows: Defendant, already dressed, awakened her and told her to get dressed as "they will be coming for me." She received a phone call. When completed, she put her hand on defendant's head and said: "Was she worth it?" He said: "No, she wasn't." Defendant called his uncle, a lawyer, and asked him to "come up to 147 East Macon as soon as you can. I killed Virginia." Moxie walked out of the kitchen and saw the shotgun setting near the T. V. with two shells on the chair. He kissed her goodbye and said: "This will probably be the last time I will kiss you for a long time."

Defendant left and went to his uncle's house where Red Hagen picked him up. Defendant said "I'm your man" or something to that effect. Defendant told Hagen where the gun was and Hagen picked it up at Moxie's.

Police officers picked up one shotgun shell on the first step of the porch about four feet from the center of the body and another in a bush about 12 feet away. Part of the decedent's head was shot away and an officer testified: "I saw parts of the body lying different places around the scene. A lot of the insides of the body were lying here and there on the porch, down the steps, in the driveway and in the street. There was much blood and tissue all over the scene."

A chemist from the State laboratory testified that there was human blood and flesh on the left shoulder area on the jacket worn by the defendant. He couldn't tell how long they had been there. He further testified that he could not say that the shells had been fired from the same firearm, but that they were ejected by the same

268

firearm. He stated: "It is scientifically impossible for any two extraction marks to be the same on a gun." He then testified that the two shells found at the scene had been extracted from defendant's gun.

Defendant testified in his own behalf and couldn't recall some of the statements attributed to him by Moxie on the morning of the 17th. He did call his uncle—he went to his uncle's house. He did call Red Hagen and he did say he must have been drunk. He disavowed any dislike for Virginia, any reason for shooting her and, what is more, states he does not believe that he did it.

■ The trial court heard and saw the witnesses and for the record carefully reviewed their evidence. He correctly concluded that the evidence of the shotgun shells and the blood on the jacket was uncontradicted and that such circumstances preclude the view that the defendant was not the active agent in Virginia's death. Defendant's statements and conduct on the following morning as related by Moxie, if believed, do not mesh with the reactions of an innocent man. Neither his conduct nor his manner suggested to Moxie, by her own testimony, that he was intoxicated. She rode with him. It was the empty bottles that made her wonder. He went to the place where Virginia worked—he drove his car and his driving caused only a lifting of eyebrows on the part of the police officers. He went toward Greider's Cafe where Virginia frequently stopped after work. He found her home in the 1300 block West Macon without apparent difficulty and returned to Moxie in the 200 block East Macon. We cannot say that his powers of reason were so beclouded as to negative malice. The trial court's determination that the evidence establishes defendant's guilt beyond a reasonable doubt was well founded.

■ It is next urged that we should reduce the degree of the offense or the penalty under the power recently

269

given us by Ill Rev Stats 1963, c 38, § 121–9. We see nothing in this record to justify the exercise of that authority. The elements of a lesser homicide are wholly lacking. The decedent was sought out and killed. No lawful justification or excuse appears. The use of two shells at short range certainly demonstrated an intention to kill or to do great bodily harm. It hardly appears to have been unintentional or accidental. The penalty was imposed by a trial judge of long experience in such matters with the full opportunity to appraise the circumstances and the defendant at first hand. The taking of a human life under the circumstances shown here should not be lightly treated. We do not think the sentence offends any principle of proper justice.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

TRAPP and CRAVEN, JJ., concur.