THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* STEVEN HUGGY, Defendant-Appellant.

(No. 55816;

First District (2nd Division)—April 16, 1974.

248

Gerald W. Getty, Public Defender, of Chicago (Robert M. Gray and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago (Elmer C. Kissane and Richard Pezzopane, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

Steven Huggy was charged with the murder of Grace Troia, his 45-year old "girlfriend." Prior to his trial, he served notice that he intended to rely on the affirmative defense of intoxication. He was tried without a jury; and after the court heard evidence in support of this defense, he was convicted.

Huggy and Grace Troia were heavy drinkers of alcoholic liquor. Al-

though not married to each other, they lived together in a house owned by Grace at 5221 South Lawndale in Chicago. It was their custom to spend occasional week-ends drinking in neighborhood taverns, ending with sojourns in a motel they patronized in Schereville, Indiana. Huggy owned a 1963 black Cadillac automobile, and on May 9, 1969, at about 4:55 P.M., he met Grace in order that they could go drinking, with the intention of spending the end of the week in the Indiana motel. At the time, Huggy had about $3100 in cash on his person. A little after 5 P.M., they arrived at a tavern on West 47th Street in Chicago, and there they spent 5½ hours drinking whiskey. Matching each other drink for drink, their consumption of intoxicating liquor was five "shots" per hour. Huggy, however, drank more than Grace because when she went to the washroom, or stopped to play a juke box, he ordered an extra drink for himself, thus consuming five or six shots more than she did during the evening. As they drank, Huggy and Grace talked about moving to San Antonio, Texas, where they could get married.

At about 7 P.M., Huggy telephoned the motel and reserved a room, telling the motel keeper that he and Grace would arrive there about 11 P.M. To accomplish this, they left the tavern to go to Grace's home, and there feed a dog and a bird preparatory for their absence during the week end. They started out in the black Cadillac; however, when they reached West 51st Street and Lawndale Avenue, Grace decided to go to a tavern on West 55th Street for "another drink." Thus, they detoured to that place and ordered some drinks, but the tavern owner told them to go home because they were both drunk. Huggy got off a bar stool to leave, but his only recollection of the rest of that evening was his "reaching for the door handle, that was all." He awoke the next morning sometime between 6:30 and 7 A.M., in a Chicago police station.

In the meantime, at about 10:40 P.M. the evening of May 9, James Klarik, a 19-year-old university student who lived across the street from Grace Troia, heard a noise and looked out of the window of his apartment. He saw a black Cadillac back up near 5221 South Lawndale; its engine and lights were then turned off. About 10 or 20 minutes later, sometime near 11 P.M., Klarik's attention was again called to the Cadillac because its motor started, it was pulling away from the curb without its lights, and it was being driven erratically, northward on Lawndale. A few minutes later, Klarik heard the noise of people carrying on a conversation outside his house. He went out, and by the curb he saw the body of a woman. It was Grace Troia, dead. In her left temple was a bullet wound that exited near her right ear.

At about 11:30 P.M. the same night, Steven Huggy, with a nearly-full quart bottle of whiskey in his hand, rang the doorbell of Emil and Margo

Wohrle, owners of a building at 5050 South Talman Street in Chicago. Steven Huggy's former wife and his two daughters lived in the Wohrle building. Margo Wohrle answered the door. She knew Huggy but had not seen him for about 2 or 3 years. After she let him into the apartment, Huggy told her and her husband to call the police because he had "shot his girlfriend;" that he wanted to transfer the title of his Cadillac to his older daughter, Diane; and that he had money to give his daughters, for which he wanted a receipt. Then, Huggy took from his pocket a gun wrapped in a towel and gave it to Emil Wohrle. At first, Wohrle refused to accept the gun; but when Huggy gave it to him a second time, he took it, still wrapped in the towel, and put it on top of a table.

In the meantime, Huggy continued to drink from the whiskey bottle he brought with him. A short time later, his former wife and his younger daughter came to the Wohrle apartment. Although Huggy told his wife that he did not want to see her (he wanted to see his daughters), he told her that he had "shot his girlfriend," and that he wanted to give the title to his Cadillac to Diane and leave some money for his children. He looked in his wallet, fumbled somewhat as he found the title to his Cadillac and executed its transfer to his older daughter. He then gave his former wife $2500 in cash. To her, it appeared that Huggy had been drinking; to the Wohrles, it appeared he had no difficulty understanding them nor did they have any difficulty understanding him. He continued to drink whiskey from the bottle until he fell to the floor, unconscious. A short time later, a police officer came to the Wohrle apartment and arrested Huggy. Another officer went to Huggy's Cadillac and found it between two automobiles correctly and legally parked. At about 1:30 A.M., two evidence technicians examined the automobile, and on the front floor near the accelerator pedal, they found an expended .38-caliber bullet. A pathological examination of Grace Troia revealed that "[s]he died of a through and through bullet wound of the head." A toxicological examination of her showed that the day after she was killed, there were .238 milligrams percent of ethanol in her blood. It was the toxicologist's opinion that immediately before her death, Grace Troia "* * * was definitely under the influence of alcohol."

At defendant's trial, an expert in pathology, testifying in answer to a hypothetical question, gave his opinion that a person who had consumed as much whiskey as Huggy had imbibed the evening he was with Grace Troia would have been so intoxicated that he could not have been able to formulate the mental state required to commit murder. After hearing the evidence, which included proof of Huggy's propensity for intoxicating liquors and the amount he consumed on the day in question, the trial judge found him guilty of murder. He then conducted a hearing in

aggravation and mitigation which revealed that Huggy was a 51-year-old life-long resident of Chicago. Only once before had he been convicted of a crime; it was an aggravated assault for which he was fined $50. He was a decorated army veteran; and at the time of his arrest for Grace Troia's murder, was gainfully employed. The court sentence Huggy to serve 20 to 40 years.

From these facts, he presents three issues. (I.) Whether the evidence proved, beyond a reasonable doubt, that he committed the acts which caused the death of Grace Troia. (II.) Whether, assuming that he committed the acts which caused the death of Grace Troia, the State proved beyond a reasonable doubt that he was capable of forming the mental state requisite for the crime of murder. (III.) Whether the sentence of 20 to 40 years is excessive.

## I.

■■ The evidence on which the State relied to prove that defendant committed the acts which caused the death of Grace Troia was circumstantial. However, it is an established rule of evidence that in a trial for murder, direct testimony is not required to prove the means that caused the death of the victim; the means and manner of death may be inferred from the circumstances proved. (*People v. Kinzell,* 106 Ill.App. 2d 349, 355, 245 N.E.2d 319.) This rule is refined by the corollary principle that when evidence in a criminal case is circumstantial, guilt must be so thoroughly established that it excludes every reasonable hypothesis of the defendant's innocence. *People v. Hanson,* 359 Ill. 266, 281, 194 N.E. 520; *People v. Bartell,* 386 Ill. 483, 54 N.E.2d 700; compare *People v. Richards,* 120 Ill.App.2d 313, 256 N.E.2d 475.

In this record there was evidence which proved that after 4:55 P.M. on May 9, 1969, Grace Troia, defendant's "girlfriend," was with him; that at about 11 P.M., his automobile was seen erratically being driven away from the place where her dead body was found; that a short time later, defendant told three persons he had shot his "girlfriend," at the same time surrendering a gun wrapped in a towel; and on the floor of his automobile was found a .38-caliber spent bullet.

■■ At his trial, defendant repudiated his statements and denied he shot Grace Troia, saying that, because of his intoxication, he had no recollection of what occurred after he and Grace started to leave the second tavern they visited. We conclude, however, that the evidence does not include any reasonable hypothesis of someone other than the defendant having committed the crime. Therefore, it is our judgment that, although circumstantial, the evidence proved beyond a reasonable doubt it was the defendant who committed the acts which caused the death of

Grace Troia. *People v. Shaw*, 64 Ill.App.2d 262, 211 N.E.2d 394; *People v. Neal*, 98 Ill.App.2d 454, 240 N.E.2d 784.

## II.

■■ This being so, absent proof of justification, excuse or mitigation, the conclusion would have been inescapable that defendant committed murder. (Compare *People v. Clemens*, 9 Ill.App.3d 312, 292 N.E.2d 232; see Perkins, Criminal Law 33-37 (2d ed. 1969).) Consequently, he interposed the defense of involuntary intoxication, thus raising the issue whether at the time of his acts he was capable of forming the requisite intent to commit murder. Our criminal law requires the State to prove not only that defendant shot and killed Grace Troia; it must prove beyond a reasonable doubt that he acted with the requisite mental state. (See *People v. Calhoun*, 4 Ill.App.3d 683, 281 N.E.2d 363.) Therefore, we must look at the evidence to see if it supports the defense of intoxication. See Ill. Rev. Stat. 1967, ch. 38, par. 6—3(a).

■■ In doing so, we bear in mind that in this State voluntary drunkenness is no excuse for the perpetration of a criminal act; it may be used to negative intent and malice only where intoxication is so extreme that it entirely suspends the power of reason. (*People v. Klemann*, 383 Ill. 236, 48 N.E.2d 957; *People v. Lion*, 10 Ill.2d 208, 139 N.E.2d 757.) Voluntary intoxication is not a defense to conduct which the law regards as criminal unless it makes impossible the existence of the mental state which is an element of the crime. (*People v. Walcher*, 42 Ill.2d 159, 163, 246 N.E.2d 256; Annot., 8 A.L.R.3d 1236.) The question, then, is not whether, at the time in question, defendant was intoxicated, but whether in the light of all the evidence relating to his intoxication he had the requisite mental state to commit murder. *People v. Jones*, 107 Ill.App.2d 1, 247 N.E.2d 40.

This record contains evidence which proved that shortly after the dead body of Grace Troia was found, defendant appeared at the home of his former wife's landlords and with apparent control of his faculties told them he had shot his "girlfriend." Moments before, he correctly and properly parked his black Cadillac between two automobiles and thereafter took part in a logical and meaningful conversation. It is significant, we think, that neither his former wife nor her landlords, had seen the defendant in 2 or 3 years. Nonetheless, displaying what was a newly-aroused concern for his future, defendant said he wanted to transfer the title of his car to his older daughter, a transaction he accurately completed without assistance. He wanted to leave some money for his children, and he had the presence of mind to ask for a receipt. When his former wife came to her landlord's apartment, defendant told her he did not want to see her but wanted to see his daughters. His older

daughter was not home; and when the younger daughter was brought to him, he recognized her and spent his time crying about his having shot his "girlfriend." Throughout the evening, defendant had $3100 on his person; and after making the rounds of taverns, he still had $2500 in cash to give his former wife for the care of his children. Knowing the vagaries of urban living, we doubt that a man can have $3100 on his person in a large city while he makes the rounds of taverns, be so intoxicated that he cannot form the intent to murder and yet preserve the amount of cash which defendant was able to deliver to his former wife.

■■ These facts were proved by the testimony of three uncontradicted and unimpeached witnesses. Thus, they were factually contrary to the basic assumptions of the opinion given by the expert pathologist who testified for the defendant. The opinion of an expert has little, if any, weight against factual testimony to the contrary. (See *McGehee v. Geo. S. Mepham & Co.*, 279 Ill.App. 115; *Rich v. Hartford Accident & Indemnity Co.*, 208 Ill.App. 506; *First National Bank v. Rovell*, 51 Ill.App. 2d 282, 201 N.E.2d 140; 6 Callaghan's Illinois Evidence § 18.26 (1964).) Therefore, we conclude that although defendant was intoxicated when he committed the acts which caused the death of Grace Troia, he was capable of forming the mental state requisite for the crime of murder.

### III.

■■ In determining whether defendant's 20-to-40 year sentence is excessive, we observe that our statute provides that "[a] person convicted of murder shall be punished by death or imprisonment in the penitentiary for any indeterminate term with a minimum of not less than 14 years." (Ill. Rev. Stat. 1967, ch. 38, par. 9—1(b).)[1] The power we have to reduce a sentence is limited for use in those instances where the punishment imposed is at variance with the fundamental spirit of our laws, or is disproportionate to the offense. (*People v. Smith*, 14 Ill.2d 95, 150 N.E.2d 815; see Supreme Court Rule 615(b)(4), Ill. Rev. Stat. 1967, ch. 110A, par. 615(b)(4).) In our judgment, the sentence in this case is not excessive. (See *People v. Hicks*, 35 Ill.2d 390, 220 N.E.2d 461; compare *People v. Lahori*, 13 Ill.App.3d 572, 300 N.E.2d 761.) The judgment is affirmed.

Affirmed.

HAYES, P. J., and STAMOS, J., concur.

---

[1] It should be noted, however, that subsequent to imposition of sentence in this case, the Supreme Court of the United States held that a defendant cannot, consistent with the federal constitution, be sentenced to death under the same Illinois statute that was invoked in this prosecution. *Furman v. Georgia* (1972), 408 U.S. 238, 33 L.Ed.2d 346, 92 S.Ct. 2726; *People v. Speck* (1972), 52 Ill.2d 284, 286, 287 N.E.2d 699; *Moore v. Illinois* (1972), 408 U.S. 786, 3 L.Ed.2d 706, 92 S.Ct. 2562.