THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLARENCE RIVERS, Defendant-Appellant.

First District (5th Division)  No. 61959

Opinion filed June 16, 1978.

Earl L. Washington, of Chicago (Edward N. Morris, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lawrence J. Bolon, Linda Ann Miller, and Jeffrey Singer, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

After a bench trial, defendant was found guilty of murdering his wife, Christine Rivers, and was sentenced to a term of imprisonment of not less than 30 years nor more than 90 years. On appeal, he contends the trial court erred in (1) failing to conduct a full evidentiary hearing on his

mental fitness to stand trial, and (2) imposing an excessive sentence after refusing to allow him to retain an attorney to represent him at the sentencing hearing. We affirm the judgment of the circuit court. The pertinent facts of this case are as follows.

Prior to trial, at defendant's request, the court ordered that defendant be examined by the Psychiatric Institute of the Circuit Court of Cook County. On July 20, 1972, a report was filed by Dr. Robert H. Reifman, a staff psychiatrist for the Psychiatric Institute, in which the doctor stated that he examined defendant on July 13, 1972, and found him competent to stand trial. He concluded that defendant "understood the nature and purpose of the proceedings and is able to assist in his own defense."

At trial, Patricia Young, niece of the deceased, testified that defendant was the husband of the deceased and that on July 10, 1971, she had helped the deceased move out of her marital household and into her family residence. Miss Young further stated that during 1971, defendant drove a gold Lincoln Continental and Christine Rivers drove a turquoise blue, 1964 Pontiac Tempest.

Herbert Stevens testified that he resided at 8108 South Blackstone in Chicago. On November 4, 1971, at approximately 6 p.m., he was sitting in his kitchen talking to his wife when he heard a loud crash. He went outside and heard someone running and hollering "Help me, help me!" On further observation he saw a man and a woman running. The woman hollered, "Help me, my husband is fixing to kill me." He watched them run toward him. The woman entered the gate to his back yard, ran to the steps of his back porch and then fell while attempting to ascend the staircase. The man was about three feet from her when she fell. He shot her five or six times, turned around, walked toward his car, entered and then drove down Harper Street, going southbound on the one-way northbound street.

After the shooting, the victim asked Stevens to call her sister. Even though the street lights provided illumination during the incident, Stevens was unable to obtain a good look at the assailant's facial features. He indicated, however, that defendant resembled the assailant with respect to height and weight.

Ivy Montgomery testified that at 6 p.m., on November 4, 1971, she heard and saw two cars turn onto 81st Street while she was walking on the 81st block of South Blackstone Street in Chicago. One of the cars was a Lincoln Mark III, the other was a little car. She watched the Lincoln cut off the smaller car. The cars then stopped, and the driver of the smaller car, a woman, jumped out of the driver's seat and screamed, "Help me * * *." Mrs. Montgomery went into her home and observed Stevens come out of his house. She saw the lady run past Stevens and onto his porch. She watched as a man got out of the Lincoln and walked toward

Stevens. The man pulled out a gun and started shooting. She then observed the assailant put the gun back "where he got it from," fasten his coat, walk back to his car and drive down Harper Street going the wrong way. She noticed that the man's car had a flat tire and was missing a hub cap.

Ora Hayes testified that her sister, Christine Rivers, was alive and in good health prior to November 4, 1971. She stated that Mrs. Rivers was married to defendant at the time of her death but had not lived with him since the time of their separation in July of 1971. Decedent, at that time, moved into Mrs. Hayes' home. Mrs. Hayes further testified that her sister possessed and operated a 1964 "Pontiac [which was] blue with [a] convertible top." Defendant owned a gold 1969 Lincoln Mark III.

Doctor Enrique Steider testified that at approximately 6:30 p.m., on November 4, 1971, he gave surgical treatment to Christine Rivers. He stated that she had received eight gunshot wounds to her lower torso and they caused her a great deal of pain.

William Ross testified that at approximately 6 p.m. on November 4, 1971, he was driving his automobile north on Harper Street and while turning west on 81st Street he observed two automobiles approaching him at high speed. He curbed his car to avoid them. The two cars collided. He identified them as a Lincoln Continental and a Pontiac. He observed a male driving the Continental and a female driving the Pontiac. He proceeded west and then turned around and saw a lady run from one of the vehicles. Ross watched the man follow and fire a pistol at her five or six times. The man then lowered his gun, turned, walked back to the Lincoln and drove away southbound on one-way northbound Harper Street. Ross noticed that the Lincoln had a flat tire and was damaged on its right front fender.

Chicago Police Officer Gene Taylor testified that he and his partner arrived at the scene of the shooting and observed a female lying face down in the rear yard at 81st and Blackstone. She was bleeding from gunshot wounds. The victim told him she had run from her husband, Clarence Rivers, to the rear porch of the Stevens' home and was asking for help when her husband shot her.

Officer Taylor also observed a 1964 Pontiac Tempest convertible parked at the curb and a 1969 Lincoln Continental parked some distance from the Stevens' back yard. Near the corner of 81st and Harper he recovered a hub cap which matched the three hub caps on the Lincoln. The Lincoln had a broken tie rod and a flat tire.

Chicago Police Officer Thomas Beland testified that he took paint scrapings from the blue Pontiac convertible driven by the victim and the gold Lincoln Continental.

James E. Doran, an evidence microanalyst for the Chicago Police

Department, testified that the blue paint samples from the gold Lincoln were "consistent" with the type of blue paint on the Pontiac. He also found that gold paint samples from the blue Pontiac were "consistent" with the gold paint on the Lincoln.

Chicago Police Officer John Ciszewski testified that on November 4, 1971, at approximately 6 p.m., he and his partner arrived at the rear of 8101 South Blackstone and observed a female lying face down on the sidewalk. He ascertained that the victim was Christine Rivers and he asked her what happened. She told him, "Clarence shot me." He asked who Clarence was and she said Clarence Rivers was her husband. Officer Ciszewski conducted a license number check on a blue Pontiac Tempest which was parked nearby and ascertained that the automobile was registered to Christine Rivers. He also checked the identification on a gold Lincoln Continental which was found only a short distance away from the crime scene and established that the vehicle was registered to defendant.

Mrs. Rivers died on November 13, 1971. Doctor Edward Shalgos, a forensic pathologist employed by the Coroner of Cook County, testified that on November 14, 1971, he performed an autopsy upon the body of Christine Rivers. He stated that decedent had suffered seven bullet wounds to her lower torso, "five being entries * * * indicating that two bullets had actually left the body." The cause of death was due to two bullet wounds of the left flank which produced internal lacerations, one of the internal lacerations led to a peritoneal abscess, which caused shock. The shock then led to the development of secondary pneumonia which brought about the death of decedent.

Following additional medical testimony which is not pertinent, the trial court found defendant guilty of the charge of murder.

On February 23, 1973, approximately two weeks after the trial ended, defense counsel moved to suspend the scheduled sentencing proceedings so that a psychiatric examination of defendant could be made to determine defendant's fitness for sentencing. In support of defendant's motion, defense counsel filed an affidavit which stated that Attorney Howard Savage personally observed "a mental deterioration" in defendant, and also had been made aware of communications between defendant and relatives of defendant which tended to indicate that defendant was not aware of the nature and purpose of the sentencing proceedings. At argument on the motion defense counsel filed "Suggestions of Doubt of Competency of Accused." After argument, the trial court granted defendant's motion and ordered a psychiatric examination of defendant regarding his fitness for sentencing. Doctor Robert H. Reifman performed his second psychiatric examination of defendant on March 12, 1973, and determined that defendant was not

mentally fit for sentencing as he did not "fully appreciate the seriousness of the guilty finding because of a mental condition."

Defense counsel thereupon moved to vacate judgment against defendant, arguing that if he was incompetent for sentencing purposes, he may have been incompetent during trial and at the time of the incident. The court then ordered another psychiatric examination to determine defendant's competence to have stood trial and his sanity at the time of the offense. In a report received by the court on April 19, 1973, Doctor Reifman stated that defendant had been mentally fit for trial, but that he was not fit for sentencing. Doctor Reifman expressed no opinion with regard to defendant's sanity at the time of the incident. On April 30, 1973, the trial court entered a finding of mental unfitness for the purpose of sentencing and remanded defendant to the Department of Mental Health.

On April 9, 1974, a hearing was held in regard to a petition to restore defendant to the status of a person fit for sentencing. Doctor Reifman testified that he examined defendant on July 13, 1972, March 12, 1973, April 12, 1973, and January 30, 1974. He stated that after he examined defendant on July 13, 1972, he concluded that defendant was not suffering from any mental disease or defect and was fit to stand trial. On March 12, 1973, he interviewed defendant and determined that defendant had acquired a mental disorder at some time subsequent to trial. The disorder was a schizophrenic reaction which prevented defendant from appreciating reality. Doctor Reifman concluded that defendant was unfit to be sentenced. The next examination was on April 12, 1973. The doctor testified that this examination led him to believe that defendant was still unfit for sentencing, but he concluded that even though defendant suffered from a mental disorder which kept him from understanding the sentencing proceeding, there was no indication that the mental disorder existed at the time of trial. The doctor further testified that upon his next examination of defendant on January 30, 1974, he concluded that defendant understood the nature of the sentencing proceeding and, therefore, was mentally fit to be sentenced. He added, however, that on January 30, 1974, defendant was still suffering from schizophrenia in partial remission.

After Doctor Reifman concluded his testimony, the court ordered another psychiatric examination of defendant by the Psychiatric Institute. On or about April 10, 1974, the doctor again examined defendant and found him mentally fit to be sentenced.

On April 11, 1974, the hearing resumed and defendant testified that he had asked his counsel to withdraw from the case on the morning of April 9 because he needed funds to "follow the case * * *." He acknowledged

that he had expressed the opinion that morning that not everything had been done that could have been done to help him, and that the court proceeding was a "sham house cleaning court procedure." When asked if he understood the present stage of proceedings, he stated that they were at the stage where the doctor determines whether he is competent to be sentenced.

The trial court then found defendant fit to be sentenced, restored him to competency and set the matter for sentencing. Defense counsel again moved the court for a hearing on whether defendant was insane at the time of commission of the crime and whether he was fit to stand trial during the course of the trial. The court denied defendant's request for a further psychiatric examination and hearing on these issues.

Defendant then indicated that he wanted his counsel to withdraw from the case. The court appointed Stanley Sacks, an assistant public defender, to represent defendant and set the matter for sentencing on April 23, 1974, so that newly appointed defense counsel could familiarize himself with the case. On that date defendant stated that he did not want Sacks to represent him, but that he was not able to represent himself and therefore would like time to acquire another attorney. The court refused to defer sentencing and again offered defendant the opportunity to have Sacks represent him. Sacks was asked by the court to "stand by" defendant, and assist him. Sacks then made a motion to withdraw because of the difficulty of coming into the case after trial and because defendant did not wish his services. However, following another request by the court, he stated that he would "stand by" and answer any questions raised by defendant.

OPINION

■■ Defendant initially contends that the court below erred after trial in failing to order a full inquiry into his fitness to stand trial and that a bona fide doubt existed as to his competency. We disagree. Section 5—2—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1) provides in pertinent part:

"(a) For the purposes of this Section a defendant is unfit to stand trial or be sentenced if, because of a mental or physical condition, he is unable:

(1) to understand the nature and purpose of the proceedings against him; or

(2) to assist in his defense.

(b) The question of the defendant's fitness may be raised before trial or during trial. The question of the defendant's fitness to be sentenced may be raised after judgment but before sentence. In

either case the question of fitness may be raised by the State, the defendant or the court.

(c) When a bona fide doubt of the defendant's fitness to stand trial or be sentenced is raised, the court shall order that a determination of that question be made before further proceedings."

Under this provision a trial judge has a duty to conduct a hearing on defendant's fitness to stand trial when, before or during trial, facts are brought to his attention which raise a *bona fide* doubt regarding defendant's fitness for trial. (See *People v. Burnside* (1977), 52 Ill. App. 3d 524, 530, 367 N.E.2d 733.) However, it is within the sound discretion of the trial judge to decide whether the facts and circumstances brought to his attention by the suggestion of counsel, by the prosecution, or by his own observation, raise such a *bona fide* doubt. (See *People v. Korycki* (1970), 45 Ill. 2d 87, 90, 256 N.E.2d 798.) In addition, while this provision contemplates a determination of fitness to stand trial prior to or during trial, it does not preclude such a determination after trial. (See *People v. Hubert* (1977), 51 Ill. App. 3d 394, 366 N.E.2d 909.) The decision to hold a fitness for trial hearing after the trial is over is within the sound discretion of the trial judge. See *People v. Hubert*, 51 Ill. App. 3d 394, 396 n. 1, 366 N.E.2d 909.

■■ In the instant case, no *bona fide* doubt over defendant's fitness to stand trial was raised and the court below did not abuse its discretion by not ordering an inquiry into defendant's fitness for trial after the trial was over. Defendant argues that the record supports the conclusion that a sufficient change occurred in his condition to require the trial court to conduct a post-trial competency hearing. His position is that the record includes evidence that demonstrates he was mentally unfit to stand trial, and further, that such evidence, when coupled with Doctor Reifman's perfunctory interviews, shows that a *bona fide* doubt existed as to his fitness to stand trial. The evidence defendant refers to includes his history of traumatic marital tragedies, bizarre letters written to a woman friend at the time of his conviction and the finding of mental unfitness to be sentenced. However, these factors alone do not create a *bona fide* doubt of defendant's fitness for trial. We have examined the record in order to determine whether there is other support for defendant's position, and we have found none. To the contrary, the record reveals that the court had before it other factors which tended to establish fitness for trial. It listened to Doctor Reifman's uncontradicted expert testimony and received two separate psychiatric examination reports which demonstrated that defendant was fit to stand trial. Concerning defendant's ability to cooperate with counsel, the court was aware that the privately retained

attorney who represented defendant during the trial did not complain at trial that his client did not comprehend the nature and purpose of the trial proceedings. Further, it appears that defense counsel failed to observe any inconsistent or abnormal personality traits in defendant at the commencement of trial as defense counsel expressly stated at that time that he rejected the defense of insanity and that defendant was ready and able to stand trial. Additionally, the court did have the opportunity to observe defendant's demeanor throughout the trial and the record demonstrates that defendant performed no acts which could have reasonably caused the court to conclude: (1) that defendant was suffering from a mental disorder during his trial; and (2) that a mental disorder caused him to lose all recognition of the proceeding's nature and purpose, or prevented him from producing an appropriate defense. Furthermore, the expert medical testimony established that defendant's schizophrenic reaction had developed subsequent to trial.

■■ Defendant next contends that he was not represented by counsel at the sentencing hearing. Sentencing is a critical stage of criminal proceedings in which the defendant has a constitutional right to representation by counsel. (See *People v. Salvaggio* (1976), 38 Ill. App. 3d 482, 487, 348 N.E.2d 243; *People v. Campbell* (1976), 37 Ill. App. 3d 511, 514, 346 N.E.2d 441; *People v. Dismore* (1975), 33 Ill. App. 3d 495, 502, 342 N.E.2d 151.) A defendant waives his right to counsel at a sentencing hearing if he knowingly and understandingly rejects representation by appointed counsel after the court has specifically and clearly offered such representation. (See *People v. Dismore*, 33 Ill. App. 3d 495, 502, 342 N.E.2d 151.) A defendant, regardless of ability to pay, has a right to have counsel appointed for him, but has no right to select from or experiment with the counsel so appointed to the detriment of the orderly processes of law. (*People v. Leman* (1968), 95 Ill. App. 2d 212, 218, 238 N.E.2d 213, *appeal denied*, 39 Ill. 2d 626.) The granting of a continuance to permit preparation of a case, or for the substitution of counsel, necessarily depends upon the particular facts and circumstances surrounding the request, and is a matter resting within the sound judicial discretion of the trial court. See *People v. Tyson* (1970), 130 Ill. App. 2d 140, 264 N.E.2d 403.

■■ The State argues that defendant is not entitled to interfere with the orderly processes of the law, and that defendant's motion for continuance was an attempt to so interfere. We agree. The trial court properly denied the motion for a continuance. In addition, we conclude that defendant knowingly and understandingly rejected representation by appointed counsel at the sentencing hearing after it was specifically and clearly offered by the court. The record reveals that defendant was represented

by Nathaniel Howse until Howse withdrew as counsel prior to trial. Attorney Howard T. Savage then filed an appearance on defendant's behalf and represented defendant throughout the pretrial motions, the trial, and the post-trial competency proceedings. After the final post-trial motion was denied, defendant insisted that Savage withdraw as his defense counsel. Defendant claimed that Savage had not done everything that he could do to help his cause. Furthermore, defendant stated that the trial was nothing more than a mere "sham, house cleaning court proceeding." The trial court granted defendant's motion that Savage be allowed to withdraw as defense counsel, and then appointed Stanley Sacks, an assistant public defender, to represent defendant. By agreement of the parties, the court postponed the sentencing hearing for 12 days, during which time defendant's new counsel reviewed the case and prepared for the sentencing hearing. Evidence in the record also indicates that during this 12 day period, an effort was made to obtain an attorney of defendant's own choosing, Fred Levinson. However, since Levinson had served within the State's Attorney's office during the period when defendant was in custody, he refused to represent defendant in order to prevent any possible later conflict of interest claims.

Defendant contends that he should have been allowed time to obtain his own attorney. At the sentencing hearing the following colloquy occurred between the trial judge and defendant.

"THE COURT: Do you wish Mr. Sacks to represent you?

THE DEFENDANT: No, I still don't wish Mr. Sacks to represent me—because I am still not able to represent myself—because I don't have any knowledge of the law and I still would like time to acquire an attorney that would handle it.

THE COURT: Again, because of all the circumstances, Mr. Rivers, and because on the last occasion I did give you the opportunity to have Mr. Savage withdraw and to appoint Mr. Sacks to represent you. I can't defer sentencing any longer, so then we'll have to proceed without your being represented by Counsel.

THE DEFENDANT: I feel that would be violating my constitutional rights at this point.

THE COURT: I would so note that is your position and again you are welcome to have Mr. Sacks, who stands here now, and who in fact talked to you and prepared for this hearing, to represent you if you wish.

I will ask him to stand by and if you have any questions you may ask him, or if you wish to present any evidence you may ask him to do so.

I would ask for his cooperation with the Court so that we may

see that your rights are protected and still be fair to all the other parties involved.

* * *

THE COURT: Let me again suggest, because I have denied your motion heretofore filed and heard, Mr. Rivers, by Mr. Savage on your behalf, for a new trial and for other appropriate motions I have denied them all, so at this point the only thing that is left to be done is sentencing, after holding a hearing in aggravation and mitigation, and again the purpose of the hearing is to determine from your background and record, if there is any, what the Court should do from the State's point of view and what the Court should do from the Defendant's point of view, based upon your lack of record or history or whatever else might be involved. So, for all of these reasons again I will deny your request for a continuance and I would ask Mr. Sacks to stand by and answer any questions you wish and we'll proceed with the hearing over your objection. Mr. Rivers, I will note your objection."

■■ It is apparent from the quoted dialogue that the trial court recognized that defendant's insistence upon an attorney of his own choosing was a mere dilatory tactic, rather than a genuine attempt to protect his right to adequate representation. Defendant could have retained his trial counsel but instead forced him to withdraw from the case. The defendant's late demand to obtain different counsel, and his refusal of appointed counsel, operated as a waiver of the right to counsel. (See *People v. Leman* (1968), 95 Ill. App. 2d 212, 238 N.E.2d 213.) Under the facts and circumstances before us, defendant's rights were protected at the sentencing hearing.

Finally, defendant contends that the 30- to 90-year sentence imposed was excessive and also argues that the sentence imposed did not correspond to the statutory sentencing guidelines. Murder is a separate class felony for which a penitentiary sentence for an indeterminate term of not less than 14 years is provided. (Ill. Rev. Stat. 1971, ch. 38, par. 9—1(b).) The Unified Code of Corrections provides that the maximum term for murder shall be any term in excess of 14 years (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(b)(1)), and the minimum term shall be 14 years unless the court, having regard to the nature and circumstances of the offense and the history and character of the defendant, sets a higher minimum term (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(c)(1)). Thus the sentence imposed is within the statutory limits. The record reflects that the trial judge did consider: (1) the presentence investigation which disclosed defendant to be a home-buying, church-attending, regularly employed individual who had never been convicted of any offenses; and (2)

the serious nature of the reprehensible crime and circumstances here involved. The evidence shows that defendant pursued his wife, Christine Rivers, in a high-speed automobile chase. He halted her car by driving his car into her automobile. She fled from her auto, ran and fell in the back yard of Hubert Stevens. Defendant chased her, caught up with her, and then stood over her and fired his weapon at her at least six times. He then walked back to his car and drove away from the scene. Mrs. Rivers died 10 days later. Furthermore, the comments of the trial judge show that he recognized the aggravating circumstances of the crime:

"THE COURT: In regard to the sentence, Mr. Rivers, of all the cases I have heard in this building for the years I have sat in, off and on, and my eleven years on the bench, there have been very few cases in which I could truly say, if the death penalty were in affect [sic], this would be an appropriate case.

Therefore, and not because I have anything against Clarance [sic] Rivers, and not because you are black, but because of the crime you committed against one Christine Rivers, our society has to do the best of its ability—if there is a marraige [sic] and it's not working you can abandon the marriage or she can abandon the marriage. You may solve the property questions. If you cannot agree there will be a Court to decide it for you.

This was a cold premeditated murder."

Nonetheless, defendant asks this court to exercise its authority under Supreme Court Rule 615(b)(4) to reduce the sentence. Ill. Rev. Stat. 1977, ch. 110A, par. 615(b)(4).

■■ The power of reviewing courts to reduce sentences should be exercised within the statutory limits with considerable caution and circumspection because the trial judge ordinarily has a superior opportunity in the course of the trial and hearing in aggravation and mitigation to determine the appropriate sentence. (*People v. Fox* (1971), 48 Ill. 2d 239, 269 N.E.2d 720; *People v. Stephens* (1974), 18 Ill. App. 3d 971, 310 N.E.2d 824.) The power is limited in use to those instances where the sentence imposed is at variance with the purpose and spirit of the law, or is greatly disproportionate to the offense. (*People v. Petty* (1975), 33 Ill. App. 3d 183, 185, 337 N.E.2d 249; *People v. Huggy* (1974), 19 Ill. App. 3d 247, 311 N.E.2d 355.) Absent a clear showing of abuse of discretion, the sentence imposed by the trial court should not be altered by a reviewing court. (*People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, *cert. denied* (1973), 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017.) In the present case, we do not believe that the sentence imposed was greatly at variance with the purpose and spirit of the law or greatly disproportionate to the nature and circumstances of the crime. We

therefore conclude that this is not a proper case in which to exercise our power to reduce sentence.

For all of the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.